THOMAS LONGWITH *et al.*, plaintiffs in error, *v.* THOMAS T. BUTLER, defendant in error.

*Error to Scott.*

At Common Law, a mortgage vested the legal estate in the mortgagee, liable to be defeated upon the performance of the condition. After default, the legal estate became absolute, but the parties might mitigate the rigor of the rule, by stipulating that the mortgagee, after default, might sell, so as to evolve the real value of the land, and have the debt satisfied and no more. Such a power was a common law power, an appointment, and considering the legal estate all the time in the mortgagee, it may be called a power appendant or annexed to the estate.

A mortgagee under a mortgage containing a clause to sell, may sell the mortgaged premises and convey a good title to the purchaser.

The rule is well established, that every thing done by the parties to a sale calculated to prevent competition, renders such sale void.

Sales of land by the mortgagee, or trustee, under a power to sell, contained in the mortgage, or deed of trust, being much liable to abuse, will be most jealously watched by Courts of Equity, and, upon the slightest proof of unfair conduct, or of a departure from the power, they will instantly be set aside. ——

BILL IN CHANCERY for relief, &c., in the Scott Circuit Court, filed by the defendant in error against the plaintiffs in error. The cause was heard before the Hon. Samuel D.

Lockwood, at the October term 1845, when a decree was entered in favor of the complainant below.

The allegations of the bill and the answers, the depositions of the witnesses, and the decree are substantially set forth in the Opinion of the Court.

The cause was submitted in this Court upon the written arguments of counsel.

*J. J. Hardin & D. A. Smith,* for the plaintiffs in error.

*M. McConnell,* for the defendant in error.

The Opinion of the Court was delivered by

KOERNER, J. Butler, complainant below, filed a bill in Chancery in the Scott Circuit Court against the appellants, setting forth in substance, that on the 24th day of September, 1841, the said Butler and wife executed a mortgage to Gilham, M'Dow, Hitt and Cline, four of the defendants, on certain tracts of land, to secure the said mortgagees in their liability as his securities, for the payment of a certain sum of money, a part of which was owing to one Morgan, and another to the Bank of Illinois. The mortgage contained a clause, that in case of Butler's failure to pay the said sums of money when due, the said mortgagees might sell from time to time, and on certain terms, so much of the real estate mortgaged, as should be necessary to raise the amount due upon said claims against Butler, at public auction, and might execute deeds of conveyance, with covenants of warranty to purchasers, and that said mortgagees might proceed by such sale or sales to reimburse themselves for all losses sustained by them, by the non-performance of the condition of the mortgage mentioned. The bill further avers that Butler made default in paying said debts, and that said mortgagees, being called on for payment, immediately sought to raise the money by sale, and did on the 26th day of Nov., 1842, without an application to a Court, and in violation of law, actually sell said land. That about this time, Butler's indebtedness to Morgan amounted to $865·00, and his indebtedness to the

Bank of Illinois nominally to $1,784·00, though owing to the depreciation of the paper of said Bank, it might have been discharged with about $600·00 in good money; that in selling said land, they did also fail to pursue the power granted to them, and grossly departed therefrom; that at the said sale, Thomas Longwith, one of defendants, purchased a large tract of the lands mortgaged, for $1,515·00; a part of which, however, he bought for the benefit of the defendants, William Sharoon and John Morrison, according to a secret understanding with said last named defendants. That the mortgagees immediately executed an absolute deed to said Longwith, and put him in possession, and that Longwith executed deeds to Sharoon and Morrison for their respective shares of the purchase, and put them in possession. That one Martin Funk, another of the defendants, at the said sale, bought another tract of said mortgaged land, and obtained a deed and possession from the mortgagees; that M'Dow, one of the mortgagees, became the purchaser of two other tracts of land, and that all these tracts of land were sold greatly below their value, and for an inadequate price. The bill charges that the mortgagees and the purchasers had conspired to sacrifice said land by various fraudulent devices, as well in the manner of the sale, as by preventing fair competition, and states the facts in detail, supporting this allegation. Many other facts and transactions are set out on the bill, which it is unnecessary to state here, as they, under the view which the Court has taken of the case, can have no bearing upon its decision.

The bill waives the oaths of all the defendants, except as to Martin Funk, and prays to set aside all these sales as utterly void, and that an account be taken of the rents and profits. Complainant alleges that he does not know how much these mortgagees have actually paid for him, or in fact, that they have paid any thing, as they have not surrendered to him the evidences of his indebtedness, and he offers to pay the full amount of money actually paid by them, and legal interest, whenever that amount is fairly ascertained by the taking of an account, and also asks for general relief.

The answer of the defendants, while it admits the indebt- edness of complainant, the execution of the mortgage for the purposes mentioned in the bill, their sale of said lands with- out application to a Court of chancery, the making of deeds to purchasers, denies that they sold without authority of law, or that they departed from the terms of sale, as provided for in the mortgage, in the slightest degree. It denies that they acted unfairly and fraudulently in the premises in any man- ner whatever. They insist in their answer, that Illinois bank paper was not so much depreciated as complainant alleges, and render an account of payments made by them, and for expenses, &c., by which they make it appear that the pro- ceeds of said sale were no more than sufficient to reimburse them, and, in fact, left complainant in their debt to a small amount. The purchasers all insist that they are *bona fide* purchasers, and as such ask the protection of the Court in the premises. To this answer there was a replication, and numerous depositions were taken by the complainant.

At the October term 1845, the Court rendered a decree which, by agreement of parties, is to be considered made *pro forma,* setting aside and annulling all the said sales, and directing the purchaser to deliver possession of all said lands to complainant within forty days after service of copy of the decree; that the Master in Chancery take an account of the rents and profits of said lands, and also of permanent im- provements made thereon by the purchasers, (except as to the lands sold to Robert McDow,) from the day of their taking possession until surrendered. Also, that the said Master take an account of what is due on said mortgage, and of what mortgagees have paid for said complainant, and in what funds, and their value.

By agreement of parties, appearing on the record, this decree is considered final in the Court below as to the rights of the parties under said sale, and so far final in all other re- spects as to enable the parties to take an appeal; and it is also agreed that this Court shall render such decree in this case, if the Court shall be of opinion that said decree is in any way defective, as the Circuit Court ought to have rendered.

The defendants assign for error that said decree is erroneous in every particular, and that the bill ought to have been dismissed for want of proof.

The first question presented by the record, as to the mortgagee's right to sell under a power of sale, without the aid of a Court of Chancery, is one of considerable importance, and about which much diversity of opinion prevails amongst the profession in our State. For this reason, it becomes necessary to examine it with care, and to give it due deliberation. At common law, a mortgage vested the legal estate in the mortgagee, liable to be defeated upon performance of the condition. After default, the legal estate became absolute. There is no question that, by the consent of both the mortgagor and mortgagee, the harshness of this rule might be mitigated. The parties were at liberty to prevent the absolute foreclosure, by stipulating that the mortgagee, after default, might sell, so as to evolve the real value of the land and have the debt satisfied, and no more. Such a power was a common law power, an appointment, and considering the legal estate all the time in the mortgagee, it may be called a power appendant or annexed to the estate. 2 Cowen, 236. It seems clear, then, that the power in question would have been a valid one at common law.

Equity has, however, obtained jurisdiction over the subject of mortgages, and has, in a spirit of humanity and justice, essentially modified the common law principles, and, as some eminent writers have said, has achieved a noble triumph over technical rules. 4 Kent, 158; 2 Story, § 1014. It will be conceded by all, who have any knowledge of the Roman law, that the equitable doctrines now universally prevailing in regard to mortgages, have been derived from that source. The civil law, in this as in many other instances, has been the great armory from which the Courts of Equity in England have supplied themselves with the most efficient weapons to ward off the severities of the stern and unrelenting common law.

Should we, therefore, be able to ascertain what the rights of the mortgagee were, as is established by the civil

law, we will not find it difficult to satisfy ourselves what they were under the rules of Equity as laid down by the English Courts.

Default of payment at the stipulated time worked no forfeiture of the mortgage or pledge by the civil law; but the creditor obtained a right to reimburse himself by sale, and ordinarily he might sell without any judicial sanction, after giving proper notice to the debtor of his intention, whether the authority to sell were expressly given to him or not. 2 Story's Eq. §1009, and the numerous authorities there cited. In fact, Courts were generally applied to in such cases only where the sale of the mortgaged estate or personal property could not be effected, for the purpose of obtaining a decretal order to vest the property absolutely in the mortgagee. 2 Story's Eq. §1024. That an authority to sell after default gave to the mortgagee complete power to sell, is a principle of the civil law which has never been disputed, and there is no reason to believe that the English Courts of Equity should have refused to adopt it, while they received the whole equitable doctrine on mortgages without essential modification, particularly when we reflect that it adapted itself so well to the common law principles of powers and appointments.

The question has been hitherto considered independent of authorities, and merely with reference to general principles; let us now discuss it as it presents itself by adjudicated cases and the observations of approved legal writers.

Mr. Powell, in his treatise on mortgages, Vol. I, page 10, seems to intimate a doubt with regard to the validity of such powers, on the authority of a decision in *Croft* v. *Powell*, Comy. 603. But in the third volume of his work containing precedents of mortgages, he gives a form of one containing such a power, and his commentator, Mr. Coventry, himself the author of a work on mortgage precedents, remarks, in a note, that the case of *Croft* v. *Powell* does not support the doubt expressed in the text. Chancellor Kent also reviews this case, and thinks it rather an authority in favor of the validity of such powers. 4 Kent, 146, note *c.* Coventry

considers the point as settled, and relies on 18 Vesey, 344; 1 Barn. & Cress. 364. Lord Eldon, in a comparatively late case, *Robert* v. *Boson*, Ch. R. 1825, expressed some doubt in regard to the question, but it appears that he answered the question, which he then made, very satisfactorily himself. He says, in that case: "Here the mortgagee is himself made the trustee. It would have been more prudent for him not to have taken upon himself that character. But it is too much to say, that if one party has so much confidence in the other as to accede to such an arrangement, this Court is, for that reason, to impeach the transaction." See 6 Madd. Ch. R. 15; 2 Sim. & Stu. 323.

The legislature of New York, as early as 1788, passed a law regulating sales made by mortgagees under such powers, upon the supposition that they were recognized as valid, and the Courts there have ever since considered such powers as perfectly proper. In an important case in the Court of Errors in New York, *Wilson* v. *Troup*, 2 Cowen, 227, Woodworth, Justice, remarked, that the insertion of the clause to sell does not confer on the mortgagee a greater security than is intended in a simple mortgage. It applies solely to the remedy, and does not impair any right of the mortgagor. Chief Justice Savage, in speaking of the Statute of New York, observes, that it supposed such a power, and only undertook to guard its exercise properly. Other authorities, sustaining the power to sell, are to be found in 1 Caines' Cases, E. 1, 4 Johns. Ch. R. 37; 7 do. 45.

In Kentucky, the Court, on one occasion, waived the decision of the question, 3 Littell, 404; on another, leaves a strong inference to be drawn that such a power is valid, and may be executed by the mortgagee according to the stipulation. 7 Monroe, 587. Justice Story, in his treatise on Equity, vol. 2, § 1027, decides in favor of the validity of such powers, and concludes his remarks upon the point by saying: "And, although Lord Eldon at first intimated an opinion unfavorable to such a power, as dangerous, it is now firmly established." Chancellor Kent, (4 Kent's Com. 146,) lays

down the same doctrine very positively, upon a review of many authorities, and seems to leave no doubt upon the point.

In the case of *Bronson* v. *Kinzie*, 1 Howard, 321, the Supreme Court of the United States had a mortgage similar to the present one under consideration, and the observations of the Court show clearly that no doubt was entertained as to the validity of such an instrument. Chief Justice Taney says, (page 327,) "At the time this deed was executed, the right to sell free and discharged of the equitable estate of the mortgagor existed in the State (Illinois) without the aid of the express covenant that the mortgagee might sell, and the only difference between the right annexed by law and that given by the covenant, consists in this, that in the former case the right of sale must be exercised under the direction of the Court of Chancery, upon such terms as it shall prescribe, and the sale made by an agent of the Court; in the latter, the sale is to be made by the party himself. But even under this covenant, the sale made by the party is so far subject to the supervision of the Court, that it will be set aside, and a new one ordered, if reasonable notice is not given, or the proceedings be regarded in any respect as contrary to equity and justice."

This Court is satisfied, from an examination of the general principles applicable to the point in question, as also from these weighty authorities, none being produced to show that any Court has decided to the contrary, that a mortgagee under a mortgage containing a clause to sell, may sell the mortgaged premises and convey a good title to the purchaser, though it must be admitted that legislative enactments prescribing uniform and proper regulations in the manner and mode of such sales, with a view to protect the interests of embarrassed debtors, would be extremely salutary, as well in cases of mortgages as deeds of trust.

It is insisted by the complainant's counsel, that this mortgage having been executed since the Act of our legislature, passed Feb. 19, 1841, in regard to judgments and executions, more generally known under the title of stay or property

law, in which it is provided that the mortgagor, or his judgment creditors, shall have the right of redemption for twelve and fifteen months respectively, after the sale of the mortgaged premises, in all cases, whether they have been sold under an execution or under a decree in chancery. The mortgagees in this case had no right to sell absolutely, so as to evade the operation of this law. Without deciding whether the language of this law would include sales made under a power to sell, or is confined to judicial sales, it is deemed a sufficient answer to this proposition to say, that this bill is not filed by the complainant, or any of his judgment creditors, for the purpose of redeeming the said lands, and that if they were seeking relief for that purpose, they have suffered the time to expire within which, according to the construction which complainant puts upon the said law, he or they were entitled to redeem. The bill prays to annul the sales, as having been made without authority and in fraud, while a bill to redeem would necessarily have to admit the validity of the transaction.

Having disposed of this branch of the case, the next question which arises is one in relation to the actual fraud charged to have been committed by all the defendants. The testimony is very voluminous, and cannot be set out in detail without swelling this Opinion beyond all reasonable length. Substantially it amounts to this; that defendant Longwith, the principal purchaser, offered to one Richard S. Walker, who had an intention of bidding for the land, $200·00 if he would not bid; that shortly before the sale, however, he expressed an indifference as to Walker's bidding or not bidding. That Walker did not attend the sale, principally for want of funds, and that the promise of Longwith did not influence him in his course. That one Marshall Smith was present at the sale, that he had a claim on complainant, Butler, and was anxious that the land should sell for enough to pay this debt also, and that he communicated his intention to Longwith; that Longwith then promised to pay said debt in the presence of the mortgagees,

if he and defendants Sharoon and Morrison would not bid. That said Marshall Smith was desirous to bid himself, and engaged in getting others to bid, but desisted after Longwith's promise. Said Smith states in his deposition, that he would not have been able to pay all if he had bid, but that his principal object was to get one Stephenson to bid, and that after Longwith had promised to pay the debt, he took no further interest in the matter. He states, also, that Longwith told him that he had offered Walker $200·00 not to attend the sale, and that he does not know, that Longwith knew he had not the money to pay for said land. John B. Campbell testifies, that such an arrangement was made between Longwith and M. Smith, as stated by Smith, in the presence of the mortgagees. Smith was not to bid for the land, and Longwith, on his part, agreed to pay the debt Butler owed·Smith. Fleming Stephenson swears, that he attended the sale for the purpose of bidding for complainant's benefit; that he was told before the sale, that the price would have to be paid down, and in good money, and that he declined bidding when he heard the sale was on these terms. That Longwith offered him $150·00 not to bid for said land, and that witness accepted said offer. He is not quite certain, whether this offer was accepted by him before or after he had understood that the money had to be good money. It is proper to remark here as applicable to the foregoing testimony, that all the persons to whom offers were made by Longwith, when interrogated by defendant, deny that they acted under the influence of said propositions, and assert that they had no corrupt motives. Martin Funk's case is next to be considered. His answer is sworn to, and by it, it appears, that previous to the sale, he made an agreement with the mortgagees to buy on certain terms, by which, amongst other arrangements, the mortgagee Hitt was to settle his own note due said Funk, on terms which could not have been but very advantageous to said Hitt. It was also agreed, that at the sale, his (Funk's) bid might be cried at $200·00, though in fact it is admitted by defendants, that

he paid.$300·00 in good money. . It is also proved that Funk made no bid at the sale, but that the land he purchased, was struck off for $200·00 by Hitt, who acted as crier, nobody bidding, but that the land was afterwards put down to Funk. It is also shown by the testimony of Wm. Coltis, that he ( Coltis ) attended the sale, and intended to bid for the land afterwards purchased by Funk, for the purpose of getting stock water, of which purpose he apprised said Funk; that Funk then told him not to bid, and that he would, in case he became the purchaser, give him the right of way over the land to the water. Witness then declined bidding, but also states in his deposition, that he made no fraudulent and corrupt bargain with said Funk, in consequence of which he desisted from bidding. The evidence clearly establishes the following other points, which are deemed material: that Sharoon and Morrison had previously arranged with Longwith, that he should purchase for them; that in fact Longwith had no money at all of his own at the time of sale, but made the first part payment with the money Sharoon paid him the next day after the sale, for the portion of the land he purchased; that the balance was paid from time to time, and the last instalment some seven months after the sale; that Morrison did not pay cash down, but gave his note, so that in fact the sale was no cash sale, but one partly on credit, contrary to the terms of the sale as made public on the day of sale; that Morrison agreed to pay a share of the money which Longworth had promised to pay Butler for not bidding.

From the facts, as thus proven by the concurrent testimony of several witnesses, the Court is clearly of opinion that the said sales from the mortgagees to Thomas Longwith and Martin Funk, as also the subsequent sales from said Longwith to Sharoon and Morrison were null and void. The rule is well established, that every thing done by the parties to a sale calculated to prevent competition, renders such sale void. The Court refrains from citing authorities in support of a principle so plain and palpable. The counsel for defendants them-

selves, do not seem to deny the rule, but they insist that the principle can have no application to the present case, because, as they contend, the complainant has not proved that the persons whom the purchasers induced not to bid for the land, were actually influenced in their actions by, the inducements so held out to them, and they ask, "how, on the true and just principles of mental or legal science, it could be properly said that any person was prevented from bidding for the lands, who never intended or deliberately proposed to bid for them." From the whole tenor of Marshall Smith's testimony, it is manifest that he desisted from bidding or getting others to bid because one of the purchasers had promised to pay him a debt, which he wanted to secure by bidding more for the land than would satisfy the mortgage. In fact, he expressly says so. But even without his testimony, will a Court of Chancery satisfy its conscience by such reasoning? It is sufficient to taint this transaction and avoid its effects, that the purchasers here have sown the seeds of evil. It is not for them to say that they have not taken root and borne their legitimate fruit. It is quite natural that the witnesses, when pressed by defendant's counsel, should deny that they acted corruptly, or from sordid motives. We must look at their acts, however, and not at their explanations. We cannot be content, upon the principles of "mental science," to take these persons as the true and proper exponents of their own deeds or motives. Human action hardly ever springs from one cause alone, but most generally from a combination of causes. But few men can trace their actions with certainty, to a preponderating motive. At the time they act, they have often become unconscious of many of the influences which indeed produced the result, and it is but too common for human nature to beguile itself into the belief that the motive which produced the act, was proper and unobjectionable, and that other less innocent causes, though they presented them, exercised no influence.

The buying off of bidders, however, is not the only act of fraud and unfair dealing imputed to and proved upon the de-

fendants. The parties to this sale held out the idea that the sales were to be made for cash in hand and good money, while they had arranged it amongst themselves, that the purchasers might buy to the greater extent on credit. Nothing, considering the times and the circumstances attending the whole transaction, as disclosed by the evidence, could have had a more powerful effect to deter bidders. This holding out of false colors as to the terms of the sale, of itself establishes the complainant's cause, and calls loudly for redress at our hands.

In this case it becomes our most imperative duty to give full scope to the remedial powers of Equity. It is admitted by all Courts that these sales, made by the trustee himself, under the power bestowed upon him by an over-confiding debtor, are much liable to abuse, and ought to be most jealously watched by Chancery Courts. Upon the slightest proof of fraud or unfair conduct, or of a departure from the power, they will be instantly set aside.

The mortgagees here were cognizant of many of these improper transactions, and one of them, Hitt, actually participated for his own advantage in them. The subsequent purchasers, Sharoon and Morrison, acquiesced in what was done by the others, and appear to have had full knowledge of the various schemes and devices resorted to to oppress complainant, and to drive him and his family from house and home. Longwith was their agent in buying the land, and his purchase was theirs. If he used fraud it must attach to them.

By an agreement of parties in the record, the question as to McDow's purchase is withdrawn from the consideration of the Court. This relieves us from a discussion and decision of the point, whether he could, under any circumstances, being one of the mortgagees and trustees, have bought any of the land. The view which the Court has taken of this case also relieves it from the consideration of numerous other points of much interest, raised by counsel in their written arguments, such for instance, as whether Butler was entitled to a formal notice of the sale, having had actual notice, whether the mortgagees could sell before they had first paid the debts

for which they were liable as securities, and whether under the power, they could sell all the land, or only so much as was necessary to raise a sufficient amount to renew the notes in bank.

The counsel for defendants lastly insist that the decree below must be reversed, and the bill dismissed, because the complainant has failed to deposit the money actually paid by the mortgagees for his use, and the legal interest.    As a general rule, he who seeks equity must do equity, and if a rescision of a contract is insisted on, the money received under it should be brought into Court.    But the peculiar circumstances of this case seem to take it out of the general rule. The complainant alleges that he never was informed of the real amount actually paid, and was never placed in possession of the notes and bills of exchange taken up by the mortgagees.    It appears that some of these bills and notes were filed with the papers, by defendants, upon the hearing of the case, or perhaps with their answers, thus showing that his allegation, as to the evidences of indebtedness not having been surrendered, was true.    Besides, it was a matter of much uncertainty how much real money it took at the time to pay the bank money, as the value of the notes and certificates of the Bank of Illinois was very fluctuating.    The complainant is also entitled to the rents and profits, while the purchasers may have a counter demand for permanent improvements.    From the nature of the case, it was impossible to anticipate what the precise amount would be, which was actually due from complainant to defendants.

As the decree is only final to a certain extent, to which, by the express consent of the parties, we have considered it as final, and as further action has to be taken, we deem it proper to direct a modification of the decree made below, calculated to better secure the rights of the defendants. The deeds should not be ordered to be set aside and cancelled, but the Master should be directed to take an account, as ordered in the decree, and to report, and that if it appear by such report that complainant is indebted to said defendants, he should, within a certain limited time, be ordered to

deposite the amount of money due by him in Court, or with the Master, for the use of the defendants, upon which deposit, the defendants be decreed to re-convey within a certain time, by deed warranting against all incumbrances by them done or suffered, or in default thereof, that the Master should convey for them, and that they surrender possession upon the payment of such money.

The interlocutory decree below is affirmed as here-modified, (the parties having expressly stipulated that this Court might make the proper modification, if deemed necessary,) and the cause remanded for further proceedings consistent with the views here expressed, the appellants to pay the costs of this Court.

*Decree affirmed.*